# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEIDI DONOVAN, AS EXECUTRIX OF THE ESTATE OF MARK JANSEN, *Plaintiff*, | ) ) ) | 3:21-CV-337 (SVN) |
| | ) | |
| v. | ) | |
| | ) | |
| MARCIA BUTLER, MICHAEL CLEMENTS, SHANNON DUNCAN, AND CATHLEEN KUZARA, *Defendants*. | ) ) ) ) | February 1, 2024 |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

While Mark Jansen was in the custody of the Connecticut Department of Correction ("DOC"), he suffered from an acoustic neuroma—a large, benign, and slow-growing tumor. In September of 2018, after his release from custody, Mr. Jansen died from post-surgery complications related to the removal of the tumor. His daughter, Plaintiff Heidi Donovan, filed this lawsuit under 42 U.S.C. § 1983, in her capacity as executrix of Mr. Jansen's estate. She alleges that Dr. Michael Clements, Registered Nurse Shannon Duncan, Registered Nurse Marcia Butler, and Registered Nurse Cathy Kuzara, who cared for Mr. Jansen while he was in DOC custody, were deliberately indifferent to her father's medical needs, in violation of the Eighth Amendment.

Defendants have now moved for summary judgment, contending that the evidence demonstrates that Mr. Jansen was not deprived of adequate medical care and they were not deliberately indifferent; alternatively, Defendants argue they are entitled to qualified immunity. For the reasons described below, the Court disagrees, in part, with Defendants. Their motion for summary judgment is DENIED as to Defendant Clements but GRANTED as to Defendants Butler, Duncan, and Kuzara.

I.       FACTUAL AND PROCEDURAL BACKGROUND

A.  Factual Background

Unless otherwise noted, the following facts are undisputed.  From October 6, 2016, until November 23, 2016, Mr. Jansen was housed at the MacDougall-Walker Correctional Institution. Pl.'s Local Rule ("L.R.") 56(a)2 Statement ("St."), ECF No. 77-1, ¶ 7.  On October 18, 2016, an unidentified medical provider—presumably at MacDougall Walker—conducted a physical examination of Mr. Jansen and noted that he was experiencing a loss of hearing in his left ear. Pl.'s L.R. 56(a)2 St. of Add'l Mat. Facts ¶ 66.  The medical note further states:  "Will get name of MD who did hearing test."  ECF No. 76-4 at 7.

On November 23, 2016, Mr. Jansen transferred from MacDougall-Walker to the Cybulski facility at the Willard Correctional Center.  Pl.'s L.R. 56(a)2 St. ¶ 7.  While at Cybulski, Mr. Jansen's medical care was overseen by Defendants Butler, Duncan, and Kuzara, who were registered nurses, and Dr. Clements, a physician.  *Id.* ¶¶ 1–6.  Mr. Jansen's transfer summary states that he denied any immediate medical issues on November 23, 2016.  *Id.* ¶ 8.

Beginning on November 26, 2016, Defendants focused their treatment on Mr. Jansen's hypertension.  *Id.* ¶¶ 9–12.  RNs Butler and Kuzara primarily interacted with Mr. Jansen through regular blood pressure checkups.  *See, e.g.*, *id.* ¶¶ 9–11.  Dr. Clements first saw Mr. Jansen on December 8, 2016, for a "chronic disease visit" concerning his hypertension and other medical issues.  *Id.* ¶ 12.  At his deposition, Dr. Clements could not recall whether he reviewed Mr. Jansen's chart prior to this visit.  Clements Dep. Tr., ECF No. 76-10, 70:9–13.  To address Mr. Jansen's high blood pressure, Dr. Clements prescribed Mr. Jansen blood pressure medication; he then continued to see Mr. Jansen periodically, reviewing and sometimes adjusting the course of treatment for hypertension.  *E.g.*, Pl.'s L.R. 56(a)2 St. ¶¶ 12, 28.  On December 11, 2016, Mr.

Jansen reported a history of facial numbness to RN Butler, stating that it dated back to a dental surgery in 2006. *Id.* ¶ 13. On December 22, 2016, Dr. Clements saw Mr. Jansen for back pain, and submitted a Utilization Review Committee request[1] to order a scan of Mr. Jansen's lumbar spine; while this request was initially denied, Dr. Clements spoke with the medical director and received approval for an MRI. *Id.* ¶ 16. Prior to the scan, Dr. Clements requested medications for Mr. Jansen to address his claustrophobia. *Id.* The MRI results showed some disc bulging and narrowing of the spinal canal. *Id.* ¶ 26.

A few weeks later, on December 27, 2016, Dr. Clements performed a preoperative exam on Mr. Jansen in preparation for a cataract surgery on his right eye. *Id.* ¶ 17. Defendants contend Dr. Clements conducted a "full systems review" at this appointment, including of Mr. Jansen's head, ear, nose, and throat systems. *Id.* According to Dr. Clements, Mr. Jansen reported no issues with his ears or hearing loss. Defs.' L.R. 56(a)1 St., ECF No. 72 ¶ 17. Plaintiff disputes that the exam was a "full systems review," noting Dr. Clements' deposition testimony indicating that he would not necessarily have asked Mr. Jansen about hearing loss ahead of a cataract surgery. Pl.'s L.R. 56(a)2 St. ¶ 17 (citing ECF No. 76-10, 86:12–16). Beginning on January 12, 2017, Mr. Jansen complained of pain and flashes of light in his eye post-cataract surgery to RNs Kuzara and Butler; RN Butler passed on this concern to Dr. Clements, who advised sending Mr. Jansen to the hospital for evaluation. *Id.* ¶¶ 21–22. Mr. Jansen returned from the hospital the same day and reported the next day that his eye was feeling much better. *Id.* ¶ 22.

Mr. Jansen's next relevant medical encounter took place on March 17, 2017, when he presented to RN Kuzara with right-sided sinus pain; Plaintiff contends Mr. Jansen also complained

---

[1] "The URC is a panel of correctional physicians who review requests for health care referral services for inmates submitted by facility providers, including specialty and other services that are not available at the facility where the inmate is housed. The URC reviews each request and determines whether to approve the request . . . ." *Robbs v. McCrystal*, No. 3:20-cv-1584 (MEG), 2023 WL 2526533, at *7 n.8 (D. Conn. Mar. 15, 2023) (cleaned up).

of a foul smell, based on his inmate request form seeking this visit.  *Id.* ¶ 27 (citing ECF No. 76-6 at 15).  RN Kuzara reviewed the issue with Dr. Clements, and Dr. Clements prescribed a fourteen-day course of antibiotics.  *Id.*

In addition to the medical records in evidence, Mr. Jansen kept handwritten notes of his medical encounters with Defendants that have been submitted by Plaintiff.[2]  Of particular relevance are two pages of handwritten notes containing entries between May 8, 2017, and June 9, 2017, that conclude with Mr. Jansen stating that he "will close out and mail to daughter Heidi to witness this."  ECF No. 76-7 at 15 ("Notes Group 1").  Plaintiff avers that she received notes from her father in the mail while he was incarcerated, which she kept for him until he was released.  Donovan Aff., ECF No. 76-16 ¶ 5.[3]

Within these two pages are a note dated May 8, 2017, in which Mr. Jansen wrote "Low Blood Sugar," "Reviewed medical chart," and "Received copy of medication report and eye dr. release to work."  ECF No. 76-7 at 14.  The notes then bear a date of "5/14" in the margin and read:  "Cont. why are you trying to get outside clearance with all these problems.  I said I'm not no more.  She stated you [can't] expect to come to jail and get all your medical problems solved.  I explained I have lost my hearing and have a huge tumor on the back of my head.  She stated do you realize how hard it is to get a MRI of your head in jail."  *Id.*  While Mr. Jansen's notes do not state the name of the person he was speaking to, his medical records reflect that he had a May 9, 2017, visit with RN Butler, at which she recorded his blood pressure, heart rate, and blood sugar, and a May 13, 2017, blood pressure check with an individual whose signature is illegible in the

---

[2] Defendants object to these notes being considered by the Court, contending they are hearsay.  The Court addresses this objection below.

[3] Plaintiff acknowledges that Mr. Jansen appears to have rewritten some of the notes, and has submitted both versions of his notes where there are two versions documenting the same visit.  ECF No. 76-16 ¶ 6.  Plaintiff's affidavit does not specify when she received any of the notes.

records.  *See* ECF No. 76-1 at 22.  In addition, in a separate section of the handwritten notes that do not themselves indicate they were going to be sent to Plaintiff ("Notes Group 2"), Mr. Jansen wrote a note dated May 14, 2017, stating:  "Went for BP check 117/81.  Marsha asked if I was on blood pressure meds.  I said yes she [recommended] I stop taking them.  I told her I was light headed.  She said stop coming to jail."  ECF No. 76-7 at 17.

Then, on May 26, 2017, Mr. Jansen had another nursing encounter with RN Kuzara.  Pl.'s L.R. 56(a)2 St.  ¶ 32.  During this visit, Mr. Jansen chiefly complained of dizziness and lightheadedness.  *Id.*  RN Kuzara performed a blood pressure test confirming that Mr. Jansen's dizziness was unrelated to blood pressure changes resulting from sitting to standing.  *Id.*  RN Kuzara's medical notes indicate Mr. Jansen reported no other neurological, respiratory, cardiopulmonary, endocrine, skin, urological, or musculoskeletal issues; Plaintiff disputes the accuracy of these notes.  *Id.*  RN Kuzara also checked Mr. Jansen's ears for any wax or infection that could cause dizziness.  *Id.*  After performing these examinations, RN Kuzara referred Mr. Jansen to Dr. Clements.  *Id.*

On June 6, 2017, Dr. Clements performed a second pre-operative exam of Mr. Jansen ahead of Mr. Jansen's left eye cataract surgery.  *Id.* ¶ 34.  Similar to the December 27, 2016, pre-operative exam, Dr. Clements attests that Mr. Jansen did not communicate any issues with his ears or hearing; Plaintiff denies this.  *Id.*  Mr. Jansen's handwritten notes indicate that Mr. Jansen communicated his dizziness to Dr. Clements, and that Dr. Clements suggested that the dizziness might have been caused by Mr. Jansen's hypertension medication.  *Id.*

During a chronic disease visit with Dr. Clements on June 20, 2017, related to Mr. Jansen's hypertension, Mr. Jansen's handwritten notes indicate that Dr. Clements did not allow Mr. Jansen

to discuss his dizziness.  *Id.* ¶ 35.  According to Dr. Clements' medical notes, Mr. Jansen did not report any neurological symptoms, dizziness, or hearing loss at this visit.  *Id.*

Mr. Jansen first encountered RN Duncan on July 11, 2017, after Mr. Jansen submitted an inmate request complaining of dizzy spells, blurry vision, and a foul smell in his nasal passage. *Id.* ¶ 36.  Mr. Jansen reported that his dizziness was episodic; that he did not have any issues with his gait, balance, hearing, eyesight, or speech; and that he was not experiencing vertigo or ataxia (poor muscle control).  *Id.*  RN Duncan placed Mr. Jansen on the sick call list to meet with Dr. Clements, with whom Mr. Jansen met two days later, on July 13, 2017.  *Id.* ¶¶ 36–37.  Dr. Clements believed Mr. Jansen's dizziness could have resulted from his blood pressure medication or sinus issues.  *Id.* ¶ 37.  Accordingly, Dr. Clements discontinued one of Mr. Jansen's blood pressure medications, ordered additional blood pressure checks, and prescribed Mr. Jansen sinus medication.  *Id.*

Over the next month, Mr. Jansen continued to meet with the Defendants about his dizziness and sinus issues.  *Id.* ¶¶ 38–41.  During this period, Mr. Jansen's sinus symptoms and dizziness did not abate, despite treatment.  *Id.*  Mr. Jansen also started reporting significant head pain, unsteady gait, and apraxia.[4]  *Id.*  To address Mr. Jansen's sinus complaints, dizziness, and apraxia, on August 15, 2017, Dr. Clements requested x-rays of Mr. Jansen's sinuses.  *Id.* ¶ 41.  Mr. Jansen's x-rays had to be taken twice because his original x-rays were mislabeled.  *Id.* ¶ 42.  The repeat x-rays taken on September 7, 2017, revealed that Mr. Jansen suffered from an inflamed sinus.  *Id.* Dr. Clements prescribed an antibiotic and steroid, and made an ENT referral.  *Id.*  Dr. Clements also requested an ultrasound of Mr. Jansen's carotid artery after Mr. Jansen reported a family history of carotid blockages.  *Id.* ¶ 41.

---

[4] Apraxia is a clinical neurological term that describes specialized or fine motor activity.  Dr. Robert Herrington Dep. Tr., ECF No. 76-12, 77:24–78:1.

Mr. Jansen's ENT appointment was scheduled for November 1, 2017.  *Id.* ¶ 42.  Between September 7, 2017, and November 1, 2017, Mr. Jansen continued to suffer from sinus issues.  *Id.* ¶¶ 43–48.  During this period, a section of Mr. Jansen's handwritten notes bearing Plaintiff's counsel's name on the first page indicates that Dr. Clements and RN Butler would not allow Mr. Jansen to discuss his sinus problems.  ECF No. 76-7 at 2, 4–5, 30–31.  On November 1, 2017, the ENT reported possible sinusitis and longstanding hearing loss.  Pl.'s L.R. 56(a)2 St. ¶ 49.  Dr. Clements requested a CT scan of the sinuses at the end of a course of antibiotics and a hearing test.  *Id.*

Then, on December 12, 2017, the CT scan of Mr. Jansen confirmed sinusitis.  *Id.* ¶ 53.  The CT scan also incidentally revealed that Mr. Jansen had a large acoustic neuroma located in the eighth cranial nerve in his brain.  *Id.*  Because treatment of the acoustic neuroma was outside of Dr. Clements' expertise, Dr. Clements referred Mr. Jansen's treatment to an ENT, who requested a contrast-enhanced MRI of Mr. Jansen's brain.  *Id.* ¶ 54.  For this MRI, Dr. Clements again requested medication to address Mr. Jansen's claustrophobia.  *Id.*

After the MRI, Mr. Jansen was seen by an ENT on January 31, 2018.  *Id.* ¶ 55.  The ENT and an outside neurosurgeon believed the best course of treatment for Mr. Jansen was two surgeries to remove the acoustic neuroma, before performing surgery on his sinuses.  *Id.*  After consulting with his doctors, Mr. Jansen advised that he wished to wait until after his release from confinement before undergoing surgery.  *Id.*  The specialists did not object to the delay.  *Id.*  Subsequently, Mr. Jansen was granted early release by DOC.  *Id.* ¶ 56.  He was released from DOC custody on March 13, 2018; after this point, Mr. Jansen was no longer under Defendants' care.  *Id.*

Between January of 2018 and May of 2018, Mr. Jansen's acoustic neuroma did not grow.  *Id.* ¶ 61.  Mr. Jansen had the two surgeries to remove the neuroma on June 8, 2018, and August

31, 2018.  *Id.* ¶ 62.  Mr. Jansen developed unspecified post-surgical complications and passed away on September 5, 2018.  *Id.* ¶ 63.

### B.  Relevant Procedural Background

After some initial discovery and modification of the Court's scheduling orders, the Court set the close of discovery on November 1, 2022.  ECF No. 37.  On October 21, 2022, Defendants filed a motion to modify the scheduling order seeking, in part, an extension to the deadline for submission of expert reports.  ECF No. 48.  The Court ultimately denied Defendants' request, finding Defendants had not shown good cause to modify the scheduling order to extend the time to disclose expert witnesses.  ECF No. 56.  Thus, Defendants have proceeded in this litigation without an expert witness.

Plaintiff disclosed one expert witness, Dr. Ryan Herrington.  Dr. Herrington explained that hearing loss is a common symptom of an acoustic neuroma, followed by dizziness and facial numbness.  Pl.'s L.R. 56(a)2 St. of Add'l Mat. Facts ¶ 119.  As Dr. Herrington explains, while acoustic neuromas are benign tumors, large acoustic neuromas are potentially life-threatening because, as the tumor grows larger, the tumor takes up more space within the bony and rigid confines of the skull and eventually will press against other nearby sensitive anatomical structures and cause injury.  *Id.* ¶ 120.  As discussed further below, Dr. Herrington only opined on Dr. Clements' treatment of Mr. Jansen; Dr. Herrington did not discuss the nurse Defendants' standard of care.  *Id.* ¶¶ 121–25; Pl.'s L.R. 56(a)2 St. ¶ 64.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the

determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable

inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## III.   DISCUSSION

For the reasons discussed below, the Court denies Defendants' motion for summary judgment as to Dr. Clements, but grants it as to RNs Butler, Duncan, and Kuzara. As to RN Duncan, Plaintiff has conceded there is insufficient evidence to conclude she acted with deliberate indifference to Mr. Jansen's medical needs, so the Court does not address her further. *See* ECF No. 77 at 1.

### A.   Legal Standard

The Eighth Amendment's cruel and unusual punishments clause "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 844 (1994)). To state an Eighth Amendment claim regarding inadequate medical treatment, Plaintiff must present evidence "showing the offending official's 'deliberate indifference to [his] serious medical needs.'" *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). There are two elements to a claim for deliberate indifference to medical needs.

The first element is objective: the alleged deprivation of adequate medical care must be sufficiently serious. *Salahuddin*, 467 F.3d at 279. The inmate must "show that he was 'actually deprived of adequate medical care' by an official's failure 'to take reasonable measures in response to a [sufficiently serious] medical condition.'" *Thomas*, 832 F. App'x at 92 (brackets in original)

(quoting *Salahuddin*, 467 F.3d at 279–80). Establishing an objectively serious deprivation requires the Court to make two separate inquiries. First, the Court must determine whether the inmate "was actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279. In assessing this issue, the Court must keep in mind that a medical provider is only required to have "act[ed] reasonably." *Id.* at 279–80 (quoting *Farmer*, 511 U.S. at 845). Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious," which requires examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280.

A "sufficiently serious" deprivation can exist if the plaintiff suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162–63 (2d Cir. 2003); *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). In addition, a medical condition may not initially be serious, but may become serious because it is degenerative and, if left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)).

Courts also distinguish claims for denial of treatment from those for delay in treatment. *See Benjamin v. Pillai*, 794 F. App'x 8, 11–12 (2d Cir. 2019) (summary order). Specifically, if

the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry is narrower, focusing "on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

The second element of a claim for deliberate indifference to medical needs is subjective. The inmate must show "that the official acted with a culpable state of mind of 'subjective recklessness,' such that the official knew of and consciously disregarded 'an excessive risk to inmate health or safety.'" *Thomas,* 832 F. App'x at 92 (internal citations omitted) (quoting first *Salahuddin*, 467 F.3d at 280 and then quoting *Hill*, 657 F.3d at 122). Allegations constituting negligence or medical malpractice are insufficient to support an Eighth Amendment deliberate indifference claim. *Id.* (citing *Hathaway*, 99 F.3d at 553); *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (stating "mere negligence" is insufficient to state a claim for deliberate indifference) (quoting *Farmer*, 511 U.S. at 835).

B.  Dr. Clements

The Court denies Defendants' motion for summary judgment as to Dr. Clements. Although it is a close question, the Court finds that there is a material issue of fact as to whether Dr. Clements' treatment of Mr. Jansen constitutes deliberate indifference to Mr. Jansen's medical needs, rather than mere negligence.

*1. Objective Prong*

Relating to the objective prong of the deliberate indifference test, the Court finds that there is a material issue of fact as to whether Dr. Clements' treatment of Mr. Jansen constitutes a sufficiently serious delay or denial in medical care.

First, drawing all reasonable inferences in Plaintiff's favor—as the Court must at the

summary judgment stage—a reasonable jury could conclude that Dr. Clements deprived Mr. Jansen of adequate medical care by failing to address his history of hearing loss, particularly when combined with his later complaints of dizziness and facial numbness. While Plaintiff admits there is no evidence in the record that Mr. Jansen communicated his hearing loss directly to Dr. Clements, *see* Pl.'s L.R. 56(a)2 St. ¶ 52, it is undisputed that, before Mr. Jansen was transferred to Cybulski, a medical provider noted in Mr. Jansen's chart in October of 2016 that he suffered from hearing loss.[5] At his deposition, Dr. Clements could not recall whether he reviewed Mr. Jansen's medical chart before beginning to treat him for various ailments. ECF No. 76-10, 70:2–13. Plaintiff has proffered evidence in the form of an expert opinion from Dr. Herrington that hearing loss is a common symptom for an acoustic neuroma, followed by dizziness and facial numbness, and that Dr. Clements' failure to "work up" Mr. Jansen's history of hearing loss and to properly assess his complaints of dizziness was a deviation from the accepted standard of care. Herrington Expert Report, ECF No. 76-14 at 2, 7, 10. Dr. Herrington further opines that, had Dr. Clements adequately assessed the hearing loss and dizziness, he may have identified the acoustic neuroma earlier, and appropriate interventions could have been taken earlier. *Id.* at 12.

---

[5] Defendants initially argued that all of Plaintiff's claims were barred by Connecticut's three-year statute of limitations because the acoustic neuroma was discovered on December 12, 2017, and the action was not filed until March 12, 2021. ECF No. 63-6 at 23 (citing Conn. Gen. Stat. § 52-577). Defendants contended that cases finding that the statute of limitations was tolled due to issuance of a Connecticut executive order suspending the relevant statutes of limitations between March 19, 2020, and March 1, 2021, due to COVID-19 were wrongly decided. *Id.* at 23–24. Curiously, Plaintiff did not respond to Defendants' statute of limitations argument in her opposition. But, considering the COVID-19 tolling order, Plaintiff's complaint was timely filed. *See Santana v. Quiros*, No. 3:21-cv-376 (SVN), 2022 WL 16706959, at *6 (D. Conn. Nov. 4, 2022) (collecting cases). Nonetheless, in their reply brief, Defendants walk their argument back, arguing instead that the Court should not consider allegations related to care prior to March 19, 2017—a date three years prior to the March 19, 2020, COVID-19 executive order. ECF No. 78 at 4. Importantly, if this argument was legally sound, then the Court could not consider the medical October 2016 note concerning Mr. Jansen's hearing loss. But Connecticut's statute of limitations applies only to the accrual of claims, not as a bar to evidence that may be submitted in support of timely claims. Conn. Gen. Stat. § 52-577; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (explaining that statutes of limitations limiting the accrual of claims do not bar parties "from using the prior acts as background evidence in support of a timely claim"). While *truly* remote evidence could be precluded at trial under Federal Rule of Evidence 403, Defendants have not argued as much, and, in any event, that is not the case with the October 2016 medical note about hearing loss at issue here.

Whether the note in Mr. Jansen's medical chart regarding his hearing loss should have alerted Dr. Clements to this medical issue and, later, to the possibility that Mr. Jansen had an acoustic neuroma, are questions of material fact for the jury to decide.  While the Court recognizes—as does Plaintiff's expert—that doctors cannot be reasonably expected to carefully comb through decades of medical history, Dr. Clements' review of Mr. Jansen's chart presents a closer question because the finding of hearing loss was one of the most recent medical notes in Mr. Jansen's chart prior to his transfer to the Cybulski facility.  *See* ECF No. 77 at 22 (quoting Plaintiff's expert explaining in his deposition that doctors are not expected to "leaf through the King James Bible in a 20-minute visit"); *see* Herrington Dep. Tr., ECF No. 76-12, 54:12–19. Because earlier diagnosis of Mr. Jansen's hearing loss could potentially have led to earlier treatment of his acoustic neuroma, slow-growing though it was, the Court cannot grant summary judgment to Dr. Clements on this point.  *See Chance*, 143 F.3d at 703 ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case."); *see also Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018) (finding that a jury should decide whether a doctor reviewed a patient's chart); *Estate of Nunez by and through Nunez v. Cnty. of San Diego*, 381 F. Supp. 3d 1251, 1261 (S.D. Cal. 2019) (finding a "spectre of deliberate indifference" where doctor testified to never reviewing patients' charts) (quoting *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 796 (9th Cir. 2016)).

The questions surrounding the adequacy of Dr. Clements' course of treatment are compounded by Dr. Clements' scant recordkeeping as to the results of Mr. Jansen's full systems reviews.  It is difficult for the Court to determine one way or another what exactly happened at these reviews.  *See* ECF No. 77 at 28 (noting Plaintiff's expert highlighting Dr. Clements' poor recordkeeping).  Because of the lack of documentation, Dr. Clements' credibility as to his own

explanation of the course of treatment—including its thoroughness or lack thereof—is critical, and must be assessed by the jury.

Further, the Court finds that Mr. Jansen's acoustic neuroma was an objectively serious condition and that there is a genuine question of material fact whether Dr. Clements' delay in treatment was unreasonable. The parties do not dispute that an acoustic neuroma is a dangerous neurological condition that can cause serious symptoms, including possibly death. And, for all the reasons already discussed, the Court agrees with Plaintiff that there is a question of material fact as to whether Dr. Clements' delay in treatment of Mr. Jansen's acoustic neuroma was objectively unreasonable. A jury must decide whether Dr. Clements should have noticed Mr. Jansen's hearing loss and whether that should have led to earlier treatment and intervention of Mr. Jansen's acoustic neuroma.

Of course, the jury may ultimately conclude that Dr. Clements' actions were medically appropriate or were merely negligent, and thus do not rise to the level of deliberate indifference. The Court acknowledges Defendants' arguments that Dr. Clements adequately treated Mr. Jansen for dizziness and his other health issues, such as hypertension, and in fact assisted Mr. Jansen by advocating on his behalf with the Utilization Review Committee, by prescribing medication for his claustrophobia before certain medical scans, and by ordering the CT scan that ultimately led to discovery of the acoustic neuroma. Defendants can present these arguments to the jury, and it will decide, after a trial, whether Dr. Clements provided constitutionally adequate care to Mr. Jansen.

### 2. *Subjective Prong*

The Court also finds that there is a material issue of fact as to whether Dr. Clements' treatment of Mr. Jansen meets the subjective prong of the deliberate indifference analysis. As the Court discussed above in its analysis of the objective prong, there is a question of material fact as

to whether Dr. Clements should have noticed Mr. Jansen's hearing loss documented in the medical chart. Defendants argue that Plaintiff cannot meet her burden on the subjective prong as a matter of law because Dr. Clements treated Mr. Jansen's reported symptoms, and there is no evidence that Dr. Clements was aware of any symptoms of Mr. Jansen's acoustic neuroma, ECF No. 63-6 at 16; ECF No. 78 at 7. The Court, however, agrees with Plaintiff that a jury should decide whether Dr. Clements' failure to discover Mr. Jansen's hearing loss is itself evidence of Dr. Clements' ignorance or apathy towards the grave risk posed by Mr. Jansen's neuroma. ECF No. 77 at 16.

As Plaintiff highlights, Dr. Clements could not recall whether he reviewed Mr. Jansen's medical chart noting his hearing loss, and Mr. Jansen did not receive a diagnosis of hearing loss until nearly a year into his time at Cybulski, when the ENT recognized on November 1, 2017, that Mr. Jansen suffered from "longstanding" hearing loss. ECF No. 76-21 at 24, 28. While Defendants are right to point out that misdiagnosis, generally, may sound in negligence or malpractice rather than deliberate indifference, the problem for Dr. Clements is that a jury could infer that his failure to review Mr. Jansen's chart is evidence of Dr. Clements' conscious disregard of Mr. Jansen's health. Because cursory treatment of an inmate can be evidence of deliberate indifference to an inmate's health, there is a question of material fact whether Dr. Clements' actions establish deliberate indifference. *See Ruffin v. Deperio*, 97 F. Supp. 2d 346, 353 (W.D.N.Y. 2000) (deliberate indifference can be demonstrated where a doctor's treatment was "cursory" or evidenced "apathy"); *see also Clark v. Quiros*, --- F. Supp. 3d ---, 2023 WL 6050160, at *21 (D. Conn. 2023) (the fact that defendants respond to an inmate's complaints and treat his symptoms does not preclude a finding that they were deliberately indifferent to a serious medical need) (citing *Hannah v. Chouhan*, No. 3:04-CV-314 (JBA), 2005 WL 2042074, at *4 (D. Conn. Aug. 24, 2005)); *accord Tyson v. Sesay*, No. 3:20-CV-296 (SVN), 2022 WL 4467021, at *4 (D.

Conn. Sept. 26, 2022) (citing *Bardo v. Wright*, Civil No. 3:17-CV-1430 (JBA), 2019 WL 5864820, at *6–7 (D. Conn. Nov. 8, 2019)).

For the same reasons as discussed above in the objective prong analysis, because of Dr. Clements' poor recordkeeping, it is difficult for the Court to determine whether Dr. Clements' failure to notice and/or record Mr. Jansen's hearing loss is evidence of Dr. Clements' alleged apathy or conscious disregard for Mr. Jansen's health.  Again, resolution of this question may turn on the jury's assessment of Dr. Clements' credibility.  For these reasons, summary judgment is not appropriate as to Dr. Clements.

### C.  RN Butler

Next, for the reasons explained below, the Court grants Defendants' motion for summary judgment as it applies to Defendant Butler.  The Court finds that Plaintiff has not supplied admissible evidence from which a jury could conclude that Defendant Butler's treatment of Mr. Jansen constituted deliberate indifference to Mr. Jansen's medical needs.

#### 1.  *Hearsay*

Initially, because Plaintiff relies heavily on Mr. Jansen's handwritten notes to support his claim against RN Butler, the Court must address Defendants' argument that the notes are hearsay.[6] Plaintiff cites to Mr. Jansen's notes to establish that Mr. Jansen told RN Butler about his hearing loss, and he claims that her failure to document this in his medical record or address this symptom amounts to deprivation of adequate care of an objectively serious condition.  Plaintiff also relies on Mr. Jansen's notes to demonstrate that RN Butler acted with a sufficiently culpable state of

---

[6] The Court's analysis of the admissibility of Mr. Jansen's handwritten notes is made for purposes of assessing the summary judgment as to RN Butler only.  Although Plaintiff cites to some portions of Mr. Jansen's handwritten notes to oppose the summary judgment motion as to Dr. Clements, the Court has not relied on any such notes in denying that portion of the motion, and so is expressing no opinion as to the admissibility of handwritten notes related to Dr. Clements.  The parties may renew their arguments concerning admissibility of the notes concerning Dr. Clements through motions *in limine* in advance of trial.

mind, through comments he recorded that she allegedly made to him.  For the reasons discussed below, Plaintiff has not met her burden of demonstrating that Mr. Jansen's notes fall under an exception to the hearsay rule, and thus the Court concludes they not admissible for purposes of deciding Defendants' motion for summary judgment.

Starting at first principles, when deciding a motion for summary judgment, a court may consider only admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2) (recognizing that a party may object that material cited in support or in dispute of a fact "cannot be presented in a form that would be admissible in evidence"); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").  The Court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion.  *See*  Fed. R. Evid. 104(a).

Hearsay, an out-of-court statement offered to prove the truth of the matter asserted therein, is generally not admissible unless an exception applies.  Fed. R. Evid. 801(c) & 802.  Hearsay within hearsay, too, can only be admitted if each part of the statement falls under an exception. Fed. R. Evid. 805.  At summary judgment, the proponent of the out-of-court statement bears the burden of proving it fits into a hearsay exception.  *Great Lakes Reinsurance (UK) SE v. Herzig*, No. 16 Civ. 9848 (PGG), 2023 WL 4266012, at *5 (S.D.N.Y. June 29, 2023) (citing *Evans v. Port Auth. of New York & New Jersey*, 192 F. Supp. 2d 247, 263 n.121 (S.D.N.Y. 2002)).

Mr. Jansen's handwritten notes are his own out-of-court statements, and his notes record out-of-court statements he made to others and out-of-court statements others made to him.  There are therefore two levels of hearsay—the notes and the statements within them—each requiring an independent basis for admissibility.  *D.R. by Rodriguez v. Santos Bakery, Inc.*, --- F. Supp. 3d ---, 2023 WL 3736441, at *2 (S.D.N.Y. 2023) (discussing hearsay within hearsay rules).

The Court focuses on the notes Mr. Jansen recorded concerning appointments in May of 2017:  a note in Notes Group 1 from May of 2017 where he wrote that he explained to an unidentified female medical provider that he had lost his hearing and that "she stated you can't expect to come to jail and get all your medical problems solved," ECF No. 76-7 at 14, and a note in Notes Group 2 dated May 14, 2017, where he reported getting his blood pressure checked and that "Marsha" (RN Butler's first name, spelled incorrectly) "said stop coming to jail" when he complained of lightheadedness, *id.* at 17.

Beginning with Mr. Jansen's alleged statement to the unidentified female medical provider, it is clear Plaintiff is seeking to admit this statement that he had lost his hearing for its truth, as it would help establish that the provider knew of the hearing loss and deprived him of adequate medical care for this symptom of the serious acoustic neuroma.  Thus, this statement must fall under a hearsay exception to be admissible.  Plaintiff argues that three possible exceptions permit this statement to be admitted:  (1) it is a present sense impression under Fed. R. Evid. 803(1); (2) it is a statement of Mr. Jansen's then-existing physical condition, under Fed. R. Evid. 803(3); and (3) it is admissible under the residual exception to the hearsay rule codified in Fed. R. Evid. 807.  ECF No. 79-1 at 2.

Mr. Jansen's statement is not admissible under any of these theories.  First, Plaintiff has not met her burden of demonstrating that Mr. Jansen's statement is a present sense impression, in that it describes or explains "an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  Such statements are "considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory."  *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002).  While "precise contemporaneity" is not required and a "slight lapse" in time between the event and the recording

is permissible, cases have typically focused on statements made during or mere minutes after the event in question. *See, e.g., United States v. Steele*, 216 F. Supp. 3d 317, 321–22 (S.D.N.Y. 2016) (collecting cases in which courts admitted 911 calls made within minutes of events under Fed. R. Evid. 803(1)); *United States v. Ibanez*, 328 F. App'x 673, 675–76 (2d Cir. 2009) (summary order) ("The statement 'That's the guy right there,' which triggered the chase, was unquestionably 'made while the declarant was perceiving the event.'") (quoting Fed. R. Evid. 803(1)); *Prescott v. R & L Transfer, Inc.*, 111 F. Supp. 3d 650, 660–61 (W.D. Pa. 2015) (finding that a statement made by the plaintiff explaining how he crashed as he was pulled from a burning truck was admissible hearsay under Rule 803(1)).

Here, the contemporaneity of Mr. Jansen's statement to the conversation with the female medical provider is unknown. The note itself bears a date of "5/14," when the medical records reflect Mr. Jansen was seen on May 8 and May 13. At best, then, the statement was written a day after the event in question. Plaintiff has pointed to the Court no cases holding that a day's lapse between the event and the statement is short enough to satisfy the present sense impression exception.[7] Indeed, the Second Circuit has held that a statement made a day after an event does not qualify as a present sense impression. *See Mohamed v. Laz Parking,* 79 F. App'x 482, 483 (2d Cir. 2003) (summary order).

Second, the statement is not one of Mr. Jansen's then-existing physical condition. The precise statement he wishes to admit is not that he was suffering from hearing loss on that day,

---

[7] Plaintiff claims that a May 14 appointment is missing from the medical records. *E.g.*, ECF No. 77 at 32. Even were the Court to assume Mr. Jansen had an appointment on May 14, Plaintiff still has not demonstrated that Mr. Jansen recorded the event so contemporaneously with its occurrence that the present sense impression exception should apply. To the extent the Court can even consider the affidavit of Yochanan Levitansky, a fellow inmate, whom Defendants claim was not timely disclosed by Plaintiff as a witness, the affidavit only states that he saw Mr. Jansen "regularly write in his notebook about the poor healthcare he was receiving from the DOC medical providers." ECF No. 76-15 ¶ 6. It does not say, for instance, that Mr. Jansen recorded notes of his medical appointments within minutes or even hours of them occurring. Because contemporaneity is what makes present sense impressions reliable for purposes of admissibility, the Court cannot conclude Mr. Jansen's statement is admissible.

but, rather, that he *told the medical provider* he was suffering from hearing loss.  While the former would be a statement of his then-existing physical condition, it is not clear the latter would be.

Finally, the Court cannot conclude that the statement bears sufficient indicia of reliability such that it is admissible under the residual exception to the hearsay rule.  The residual exception is to be used "very rarely, and only in exceptional circumstances."  *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (quoting *Huff v. White Motor Corp*. 609 F.2d 286, 291 (7th Cir. 1979)).  A significant requirement of the residual exception is "that the hearsay evidence have circumstantial guarantees of trustworthiness that are equivalent to or exceeding the guarantees reflected by the presently listed exceptions."  *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296, 311 (D. Conn. 2016) (cleaned up) (quoting *Brown ex rel. Estate of Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 512 (D.N.J. 2002)); *see also* Advisory Cmte. Note to Paragraph (24), Fed. R. Evid. 803).  The Court cannot find this to be true here.  Although Notes Group 1 was apparently "close[d] out," ECF No. 76-7 at 15, and sent to Plaintiff by Mr. Jansen in June of 2017—months before discovery of the acoustic neuroma—the notes were clearly intended to document what Mr. Jansen perceived as deficient medical care by Defendants.  He therefore could have had an incentive to shade his notes to favor his view of events, undermining their reliability.  In short, Plaintiff has not met her burden of establishing that the statement is "especially trustworthy." *Batoh*, 167 F. Supp. 3d at 311.

The Court turns next to the out-of-court statements made by *others* that are recorded in Mr. Jansen's notes:  specifically, the statement allegedly made by an unidentified female medical provider that Mr. Jansen should not "expect to come to jail and get all your medical problems solved," and the statement by "Marsha" that he should "stop coming to jail" when he complained of lightheadedness.  While Plaintiff does not seek to admit these statements for their truth—that

Mr. Jansen should not have expected to get medical treatment in jail and should stop going coming to jail—she seeks to admit *Mr. Jansen's statements* that medical providers made these statements to him for their truth.  Put another way, she would want a jury to believe that Mr. Jansen was telling the truth when he recorded that the medical providers made these remarks to him.  Thus, she is seeking to have the statements admitted for their truth, and the statements must fall under a hearsay exception to be admissible.

The Court reaches the same conclusion about the admissibility of these portions of the notes:  they are inadmissible.  As noted above, there is no evidence that Mr. Jansen recorded these statements so contemporaneously with their utterance that they meet the present sense impression exception.  Nor do the statements evince Mr. Jansen's then-existing physical condition or state of mind.  Although they may be probative of the medical providers' states of mind, it is the *declarant*'s state of mind that must be considered under the exception.  Mr. Jansen is the declarant, and the statements do not relate to his state of mind (to the extent his state of mind is even relevant to an Eighth Amendment claim).  Finally, the alleged statements do not bear sufficient indicia of reliability to qualify for the residual exception.  Mr. Jansen had an incentive to exaggerate these remarks to help establish his case of deficient medical care.  Indeed, the statement allegedly attributable to "Marsha" does not appear in Notes Group 1, which Mr. Jansen supposedly sent to his daughter shortly after June 10, 2017, so the Court can have no confidence it was not recorded at some later date, in anticipation of litigation against Defendants.

In sum, the Court finds that the handwritten notes on which Plaintiff relies to state her claim against RN Butler are inadmissible, and it will not consider them.  Without the notes, Plaintiff falls back on the same theory she advances as to Dr. Clements:  had RN Butler adequately reviewed Mr. Jansen's medical chart, she would have seen that he had complained of hearing loss to a

previous provider in October of 2016, and she should have addressed that issue.  Plaintiff also argues that RN Butler demonstrated deliberate indifference by not reviewing Mr. Jansen's chart. ECF No. 77 at 34.

2. *Discussion*

The Court cannot conclude that Plaintiff has demonstrated a genuine issue of material fact regarding RN Butler's treatment of Mr. Jansen.  First, while Plaintiff has provided expert testimony concerning a doctor's obligation to review a patient's medical history before treating him, he has provided no such expert testimony as to a nurse's obligation.  Even if RN Butler were obligated to comprehensively review the chart and her failure to do so caused a sufficiently serious delay in treatment, however, there is no admissible evidence that she acted with the culpable state of mind required to support a deliberate indifference claim.  While the Court found that the Plaintiff could proceed to a jury as to Dr. Clements' alleged cursory review of the medical records on a theory of apathy, this finding was supported by expert testimony about a doctor's obligation to review a patient's recent medical history.  Plaintiff has pointed to evidence in the record suggesting that RN Butler's obligations were coextensive with Dr. Clements', particularly given that RN Butler's interactions with Mr. Jansen were more limited in scope.  At most, a jury could conclude that her actions may have been negligent.  But negligence does not give rise to an Eighth Amendment violation. *Thomas,* 832 F. App'x at 92; *see also Walker*, 717 F.3d at 125 (stating mere negligence is insufficient to state a claim for deliberate indifference).  Thus, the Court grants summary judgment in favor of RN Butler.

D.  RN Kuzara

Finally, the Court grants summary judgment in favor of RN Kuzara because she was not involved in any way with the diagnosis or treatment of Mr. Jansen's acoustic neuroma, and

therefore did not objectively fail to provide him with treatment.

Plaintiff has provided no evidence that Mr. Jansen ever informed RN Kuzara of his hearing issues. Further, RN Kuzara's interactions with Mr. Jansen were largely limited to regular blood pressure checks. *See* ECF No. 78 at 9. As with RN Butler, Plaintiff has presented no evidence regarding a nurse's obligation to comprehensively review a medical chart before administering a blood pressure check on a patient. When Mr. Jansen reported other symptoms to RN Kuzara, such as when Mr. Jansen appeared to RN Kuzara with an unsteady gait, she referred him to Dr. Clements. *Id.* at 9–10. Thus, because RN Kuzara was never made aware of Mr. Jansen's hearing loss, would not ordinarily have been expected to check for such symptoms during her blood pressure checkups with Mr. Jansen, and because Plaintiff has provided no evidence that RN Kuzara was subjectively deliberately indifferent to Mr. Jansen's health needs, Plaintiff has not demonstrated any genuine issue of material fact sufficient to overcome summary judgment. The Court grants summary judgment in RN Kuzara's favor.

E. Qualified Immunity

Finally, Defendants argue that, even if there are questions of material fact concerning whether they violated Mr. Jansen's Eighth Amendment rights, they are entitled to summary judgment because they are protected by qualified immunity. Given that the Court has granted Defendants' motion for summary judgment as to all Defendants but Dr. Clements, it need only reach the qualified immunity issue as to him. As the same questions of material fact that permeate the Eighth Amendment inquiry also permeate the qualified immunity question, the Court cannot grant summary judgment to Dr. Clements on this ground.

The doctrine of qualified immunity shields governmental officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The United States Supreme Court has set forth a two-pronged test governing the qualified immunity defense. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 232 (internal citations omitted). As explained above, there are genuine issues of material fact as to whether Dr. Clements was deliberately indifferent to Mr. Jansen's medical needs in violation of the Eighth Amendment.

Even if a defendant may have violated the plaintiff's constitutional rights, however, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A prison official's conduct "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every 'reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Accordingly, this prong "turns on the objective legal reasonableness of the defendant's action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (cleaned up) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). In other words, "even if the plaintiff's federal rights were clearly established at the time of the alleged violation, the defendants may nevertheless enjoy qualified immunity if it was objectively reasonable for them to believe that their actions did not violate those rights." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995). The question of

whether an official's conduct was objectively reasonable "is a mixed question of law and fact." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004).

The Court cannot hold that Dr. Clements is entitled to qualified immunity. First, Mr. Jansen's constitutional right to receive adequate medical care as an inmate has been clearly established under the law for decades. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (recognizing right of an inmate to adequate medical care). Defendants do not dispute this point.

Second, the Court finds that the jury must decide whether Dr. Clements' actions were objectively reasonable, under the circumstances. While Defendants are right to point out that an acoustic neuroma is a rare and slow-growing tumor, this feature of Mr. Jansen's condition does not automatically mean Dr. Clements' treatment of Mr. Jansen was entirely reasonable. Instead, as the Court has already discussed in relation to its deliberate indifference analysis, whether it was reasonable for Dr. Clements to fail to notice or work up Mr. Jansen's hearing loss is a question of fact for the jury to decide. That Dr. Clements may have reasonably believed Mr. Jansen's symptoms were related to something other than an acoustic neuroma does not change the fact that Dr. Clements was operating on imperfect information—potentially due to a failure to review Mr. Jansen's recent medical history. Accordingly, drawing all inferences in Plaintiff's favor, the Court cannot conclude, as a matter of law, that Dr. Clements' conduct was objectively reasonable, for purposes of qualified immunity. The jury must decide this question. *See Oliveira v. Mayer*, 23 F.3d 642, 649–50 (2d Cir. 1994) (finding error where district court did not submit to the jury the question of whether the defendant's actions were objectively reasonable, for qualified immunity purposes).

For these reasons, the Court denies summary judgment to Dr. Clements on qualified immunity grounds.

## IV.     CONCLUSION

For the reasons described herein, Defendants' motion for summary judgment is DENIED as to Defendant Clements and GRANTED as to Defendants Butler, Duncan, and Kuzara.

The Court enters the following orders.

(1) Defendants Butler, Duncan, and Kuzara are dismissed from the case.

(2) The Court will convene a conference with Plaintiff and Defendant Clements to set a trial date and deadlines for pretrial submissions.

**SO ORDERED** at Hartford, Connecticut, this 1st day of February, 2024.

         */s/ Sarala V. Nagala*
         SARALA V. NAGALA
         UNITED STATES DISTRICT JUDGE